**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

MARIA CASTENADA JUAN, et al., :
:
:
    Plaintiffs, :
:
    v. :    CIVIL ACTION NO.
:    2:14-CV-199-RWS
MINNESOTA LIFE INSURANCE :
COMPANY, et al., :
:
    Defendants. :

## <u>ORDER</u>

This matter is before the Court on Plaintiffs' Motion for Summary Judgment [Doc. No. 43], Plaintiffs' Amended Motion for Summary Judgment [Doc. No. 50], Defendant Minnesota Life Insurance's Motion for Summary Judgment [Doc. No. 57], Defendant Shaw Industries Group's Motion for Summary Judgment [Doc. No. 63], and Plaintiffs' Motion to Dismiss Defendants' Motions for Summary Judgment [Doc. No. 70]. As an initial matter, in light of Plaintiffs' Amended Motion for Summary Judgment [Doc. No. 50], Plaintiffs' Motion for Summary Judgment [Doc. No. 43] is DISMISSED as moot.

## I.   Factual Background[1]

This case began when Plaintiffs sued Minnesota Life in the Superior Court of Gilmer County, Georgia, asserting state law claims for the alleged breach of a life insurance policy [Doc. No. 1-1].  Plaintiffs sought recovery of death benefits, interest, statutory penalties of 25% under O.C.G.A. § 33-4-6, and punitive damages of $1,000,000.  Minnesota Life removed the case to this Court on September 3, 2004, based on federal question jurisdiction, as Plaintiffs asserted claims for benefits from plans governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") [Doc. No. 1].

### A.   Minnesota Life

Mr. Jacinto, an eligible employee of Shaw Industries, was insured under Group Policy No. BH-100, a policy of group life insurance and accidental death insurance issued by Minnesota Life to Berkshire Hathaway as policyholder.  The Policy was delivered to Berkshire Hathaway at its principal place of business in Omaha, Nebraska.  Companies associated with Berkshire Hathaway, including

---

[1] The Court notes that Plaintiffs have failed to respond to Defendants' Statements of Material Fact attached to their Summary Judgment Motions [Doc. Nos. 57 and 63].  Pursuant to Local Rule 56.1B(2), the Court deems the facts as presented in the Statements of Material Fact [Doc. Nos. 57-13 and 63-2] admitted.

AO 72A
(Rev.8/8
2)

Shaw Industries, participated in the Policy to provide life insurance and accidental death insurance benefits to their ERISA plan participants.

Shaw Industries sponsored and maintained the ERISA plan and was the Plan Administrator.  Minnesota Life administered claims for life insurance and accidental death insurance benefits under the Plan and paid those benefits from its own funds.  The Policy provided that Minnesota Life would pay the death benefit "upon receipt at our home office of written proof satisfactory to us that the participant died while insured under the Policy" [Doc. No. 57-2, p. 13].  The documents compiled by Minnesota Life during its administration of Plaintiffs' claim constitute the Administrative Record [Doc. Nos. 57-4, 57-5, and 57-6].

Mr. Jacinto was insured under the Policy for a life insurance benefit of $30,000 and an accidental death insurance benefit of $30,000.  Mr. Jacinto did not designate a beneficiary [Doc. No. 57-4, p. 2].  As a result, his wife, Ms. Juan, was the "default beneficiary" under the Policy [Doc. No. 57-2, p. 13].  Mr. Jacinto was murdered in Guatemala on June 13, 2012.  His death was reported to Minnesota Life electronically on June 28, 2012, by Veronica Lopez of Shaw Industries [Doc. No. 57-4, pp. 1-3].  Also on June 28, 2012, Ms. Lopez faxed to Minnesota Life an English translation of Mr. Jacinto's Guatemalan death certificate which was not

3

certified [Doc. No. 57-4, pp. 4, 9].

On July 9, 2012, attorney James Satcher called Minnesota Life and stated that he represented Mr. Jacinto's family [Doc. No. 57-4, p. 17].  On July 10, 2012, a Minnesota Life employee told a representative of Mr. Satcher's office that the matter had been assigned to a claim examiner and that the status of the claim could be checked by referring to a Minnesota Life website [Doc. No. 57-4, p. 18].

Minnesota Life then began an extended effort to obtain the documents needed to review and pay the claim, including a certified copy of Mr. Jacinto's death certificate and evidence that his death was accidental within the terms of the Policy.  When the information was not received, Minnesota Life sent seven computer-generated letters to Mr. Satcher over the next eight months, requesting police reports related to Mr. Jacinto's homicide [Doc. No. 57-4, pp. 19-25].  On May 20, 2013, Minnesota Life received a fax, which included a fax cover sheet followed by an illegible document, from Mr. Satcher [Doc. No. 57-4, pp. 26-27]. On June 4, 2013, another fax cover sheet was received, followed by: (1) Letters of Administration issued by the Probate Court of Gilmer County on May 29, 2013, appointing Plaintiff Domingo Lopez Jacinto as administrator of Mr. Jacinto's estate; (2) an English translation of a Guatemalan document entitled Civil

4

Registration of Persons Death Registration, which recited that Mr. Jacinto had died on June 13, 2011 [sic], of head trauma "[s]econdary to [i]njury by firearm projectile"; (3) an illegible document; and (4) a barely legible document which appeared to be a copy of Minnesota Life's earlier letter to Mr. Satcher dated April 27, 2013, requesting a report of Mr. Jacinto's homicide [Doc. No. 57-4, pp. 28-33].

On June 10, 2013, a representative of Mr. Satcher's office told Minnesota Life by telephone that "they" wanted the insurance benefits to go to Mr. Jacinto's estate for the benefit of his children, because his wife was not a United States citizen and there would be problems having her complete claim forms [Doc. No. 57-4, p. 38].  On June 13, 2013, an employee of Minnesota Life sold Mr. Satcher's office by telephone that the documents received by fax would be reviewed by a claim examiner [Doc. No. 57-4, p. 36].  On July 19, 2013, an employee of Minnesota Life spoke by telephone with Mr. Satcher and informed him that Minnesota Life needed IRS Form W-8BEN before benefits could be paid [Doc. No. 57-4, p. 40].  Form W-8BEN was requested because of reporting requirements imposed by the Internal Revenue Service on Minnesota Life as a "withholding agent" under Chapter 3 of the Internal Revenue Code.  Form W-8BEN is publicly

5

available on the IRS website.

On August 19, 2013, Minnesota Life wrote to Mr. Satcher requesting: (1) a completed Foreign Death Questionnaire; (2) an original certified death certificate; and (3) legible copies of the documents that had been faxed to Minnesota Life on June 3, 2013 [Doc. No. 57-4, p. 44].  When those documents were not received, Minnesota Life sent six computer-generated letters to Mr. Satcher over the next three months, reminding him of the request for the Foreign Death Questionnaire and an original certified death certificate [Doc. No. 57-4, pp. 45-54].  By letter to Minnesota Life dated December 10, 2013, Mr. Satcher's assistant sent: (1) the completed Foreign Death Questionnaire (which was signed by Mr. Satcher as "Atty for Estate and Wife"); (2) a copy of the same Civil Registration of Persons Death Registration that had been received earlier; (3) a copy of the same Letters of Administration issued by the Probate Court of Gilmer County that had been received earlier; (4) a copy of Mr. Jacinto's Permanent Resident Card; (5) an Order Appointing Personal Representative dated March 21, 2013, by which the Probate Court of Gilmer County appointed Domingo Lopez Jacinto as personal representative of his brother's estate; (6) the first page of an Affidavit for Financial Institutions, authorizing Domingo Lopez Jacinto to deal

6

AO 72A
(Rev.8/8
2)

with his brother's account at United Community Bank; and (7) copies of Spanish language newspaper articles reporting Mr. Jacinto's death [Doc. No. 57-4, pp. 56-71]. An original certified copy of the death certificate was not provided.

On March 8, 2014, Minnesota Life wrote to Mr. Satcher requesting a police report of Mr. Jacinto's death [Doc. No. 57-4, p. 75]. By letter dated March 17, 2014, Mr. Satcher's assistant stated "a police report DOES NOT exist," and she enclosed a Spanish language document which she described as "Direction Area of Health Huehuetenango Sanitary Authorization of Corpse Transfer" [Doc. No. 57-4, pp. 77-78].

On February 21, March 26, April 9, and April 23, 2014, Minnesota Life sent letters to Mr. Satcher requesting a Form W-8BEN signed by Ms. Juan, as the surviving spouse of Mr. Jacinto [Doc. No. 57-4, pp. 74, 81-86]. Instead of providing Form W-8BEN, Mr. Satcher's assistant sent a letter dated May 14, 2014, enclosing: (1) Preference Beneficiary's Statement, signed "Maria Castaneda Juan" and dated "4/05/2014", and (2) a Financial Power of Attorney, prepared for "Maria Lopez Castaneda" and signed "Maria Castaneda Juan" and dated "this 04 day of 05, 2014" [Doc. No. 57-4, pp. 87-93]. The Preference Beneficiary's Statement included the statement, "I am the surviving lawful wife or husband of

7

the insured" [Doc. No. 57-4, pp. 88-89]. The Financial Power of Attorney consisted of 14 numbered paragraphs, some of which were initialed "MCJ" and some of which were initialed "JAS" [Doc. No. 57-4, pp. 90-91]. The Financial Power of Attorney bore two signatures of a notary public, apparently attesting that he had witnessed the execution of the document both in Huehuetenango, Guatemala, and in Floyd County, Georgia [Id.].

Minnesota Life wrote to Mr. Satcher twice more to request a Form W-8BEN completed by Ms. Juan, as the surviving spouse of Mr. Jacinto [Doc. No. 57-5, pp. 2-5]. On June 12, 2014, after reviewing the Financial Power of Attorney, Minnesota Life wrote to Mr. Satcher's assistant requesting additional information, including a form where Ms. Juan clearly grants the power to collect the benefits to Mr. Satcher [Doc. No. 57-5, p. 6]. After having the Financial Power of Attorney reviewed by its Legal Department, Minnesota Life wrote to Mr. Satcher on June 17, 2014, raising concerns about whether Ms. Juan intended to transfer powers relating to personal property and banking transactions to Mr. Satcher [Doc. No. 57-5, p. 7]. Mr. Satcher's assistant responded by faxing a letter dated June 17, 2014, which stated that Ms. Juan is represented by Mr. Satcher and that the Financial Power of Attorney had been sent back to Mr. Jacinto's brother to

8

obtain her initials to complete the document [Doc. No. 57-5, pp. 8-10].  In the same letter, Mr. Satcher's assistant demanded payment of the benefits within ten days and stated that if payment was not made that suit would be filed [Id.].  On June 18, 2014, a supervisor in Minnesota Life's Group Claims Department emailed Mr. Satcher and attached a blank Form W-8BEN and stated the form was necessary before Minnesota Life could issue payment [Doc. No. 57-5, p. 13].

### B.    Filing of Original Complaint

Instead of providing a signed form W-8BEN, Mr. Satcher filed this action in Gilmer County on July 3, 2014.  Mr. Satcher's assistant faxed a copy of the Complaint to Minnesota Life on July 10, 2014, together with: (1) copies of the Marriage Certificate of Ms. Juan and Mr. Jacinto; (2) another copy of the Letters of Adminsitration issued by the Probate Court of Gilmer County; (3) another copy of Mr. Jacinto's Permanent Resident Card; and (4) a copy of Mr. Jacinto's Social Security Card [Doc. No. 57-5, pp. 14-23].

After learning that the lawsuit had been filed, Erich J. Axmacher, an attorney in Minnesota Life's Law Department, spoke with Mr. Satcher by telephone and then by email July 16, 2014 [Doc. No. 57-5, p. 24].  Mr. Axmacher stated that Minnesota Life had determined that benefits were payable but that an

9

AO 72A
(Rev.8/8
2)

executed W-8 beneficiary form was required in order to proceed with payment [Id.].  Instead of providing the executed Form W-8BEN, Mr. Satcher responded to Mr. Axmacher by letter dated July 17, 2014, enclosing copies of the same documents sent by his office earlier [Doc. No. 57-5, pp. 25-26, 28-43; Doc. No. 57-6, pp. 1-12].  Additionally, rather than providing an executed Form W-8BEN, Mr. Satcher asked that Minnesota Life allow him to sign a Form W-8IMY as an individual authorized to sign for Ms. Juan, in light of the Financial Power of Attorney [Doc. No. 57-5, pp. 25-26].  Mr. Axmacher responded that the Form W-8IMY was unacceptable because it could only be completed by a foreign entity or a foreign-owned domestic entity who has a withholding agreement with the IRS [Doc. No. 57-6, p. 13].

On September 10, 2014, Minnesota Life filed an Answer setting out its defenses, including ERISA preemption of Plaintiffs' state law claims, failure to exhaust administrative rememdies, and failure to provide the properly executed documents needed to pay the death benefits [Doc. No. 4]. On September 15, 2014, counsel for Minnesota Life received an email from Plaintiffs' attorney with an executed Form W-8BEN signed "Maria Castenada Juan" and dated July 9, 2014 [Doc. Nos. 57-8 and 57-9].

10

Minnesota Life then requested a Rule 16 conference with the Court for the purpose of discussing how to pay the death benefits [Doc. No. 6, ¶ 9]. The Court conducted the Rule 16 conference on October 29, 2014, at which time Plaintiffs' attorney requested that a check for the death benefits be issued jointly to Ms. Juan and to him. The Court entered an order to that effect [Doc. No. 9]. Minnesota Life issued two checks payable to "Maria Castaneda Juan and her attorney, James A. Satcher, Jr." and mailed them to Mr. Satcher. The first check was for $34,489.99, in payment of the life insurance benefit of $30,000 and interest of $4,489.99 [Doc. No. 57-10]. The second check was for $34,489.99, in payment of the accidental death insurance benefit of $30,000 and interest of $4,489.99 [Id.].

## C.    Shaw Industries

Parallel to his interactions with Minnesota Life, Mr. Satcher was also corresponding with Mr. Jacinto's employer and the Plan Administrator, Shaw Industries. On August 14, 2013, Mr. Satcher sent a letter to Shaw Industries seeking documentation that would explain Mr. Jacinto's benefits [Doc. No. 63-3, p. 5]. Ms. Jaber, a paralegal for Shaw, received and reviewed the August 14 letter. She then responded by letter on August 21, 2013 [Doc. No. 63-3, p. 7]. In her

11

letter, Ms. Jaber stated that Shaw Industries would not release this information without a Request for Production of Documents or an executed release of information by the estate [Id.]. Ms. Jaber received no response from Plaintiffs after sending the August 21 letter. Plaintiffs admitted that they did not send any correspondence and made no verbal response in response to Ms. Jaber's August 21 letter [Doc. No. 63-5, p. 20].

On March 24, 2015, Eddie Reeves, the Director of Human Resources Operations for Shaw Industries, sent a letter that instructed Mr. Satcher how to obtain payment of Mr. Jacinto's 401k balance of $665.41 (for which he did not designate a beneficiary [Doc. No. 63-4, pp. 9-12]. Mr. Reeves requested Mr. Jacinto's spouse's name, address, birth date, and Social Security number. Mr. Reeves did not receive a response from Mr. Satcher or Plaintiffs.

On May 22, 2015, Patrick Lail, counsel for Shaw Industries, emailed Mr. Satcher and attached the March 24 letter from Mr. Reeves [Doc. No. 63-5, p. 6]. Neither Mr. Satcher nor Plaintiffs submitted the requested information. Again, on July 1, 2015, Mr. Lail sent Mr. Satcher an email that attached Mr. Reeves' March 24 letter [Doc. No. 63-5, pp. 12-14]. Neither Mr. Satcher nor Plaintiffs submitted the requested information.

12

### D.   Filing of Amended Complaint

On February 6, 2015, Plaintiffs filed a Motion to Amend their Complaint to add as defendants Berkshire Hathaway and Shaw Industries [Doc. No. 13].  On February 11, 2015, the Court granted the Motion to Amend [Doc. No. 14].  In their Amended Complaint [Doc. No. 15], Plaintiffs assert the following:

-    That the Plan was sponsored and maintained by Shaw Industries and Berkshire Hathaway under ERISA [Doc. No. 15, ¶¶ 3, 9];

-    That Shaw Industries and Berkshire Hathaway "are the Plan Administrator of the Plan(s)" [Doc. No. 15, ¶ 9];

-    That the Plan Administrator has never provided the Plan(s) documents as required by ERISA, 29 U.S.C. § 1132 [Id.]; and

-    That the "Plan Administrator is liable to Plaintiff for $52,700, being $100 per day from the date of the demand for those documents" [Doc. No. 15, ¶ 12].

Plaintiffs also asserted that Defendants owe Plaintiff an additional 6% interest pursuant to O.C.G.A. § 33-25-10 [Doc. No. 15, ¶ 11].  On April 1, 2015, Berkshire Hathaway was dismissed from this action without prejudice [Doc. No. 26].

13

## II.   Plaintiffs' Motion to Dismiss Defendants' Motions for Summary Judgment [Doc. No. 70]

Plaintiffs have moved to dismiss Defendants' Motions for Summary Judgment as untimely filed [Doc. No. 70].  The Court finds that the Motions for Summary Judgment [Doc. Nos. 57 and 63] were timely filed for the reasons described in Defendants' responsive briefing [Doc. Nos. 71 and 72].  As such, Plaintiffs' Motion to Dismiss [Doc. No. 70] is DENIED.

## III.   Legal Standard - Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden

14

shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences that are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule

AO 72A
(Rev.8/8
2)

56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## IV.   Defendant Minnesota Life Insurance's Motion for Summary Judgment [Doc. No. 57]

Defendant Minnesota Life contends that it is entitled to summary judgment for three reasons: (1) Plaintiffs have asserted their claim for a § 1132(c)(1) penalty against Minnesota Life for the first time in their summary judgment brief, and therefore it is untimely; (2) it is not the plan administrator and thus cannot be assessed a penalty under § 1132(c); and (3) under Nebraska law, the governing law regarding interest, it has already overpaid any interest that could be required.

### A.   Untimely Assertion of Penalty Provision

Minnesota Life contends that Plaintiffs have alleged for the first time in their summary judgment brief that they are entitled to a § 1132(c)(1) penalty against Minnesota Life, and therefore their request is untimely. The Court agrees. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Federal Rule of Civil Procedure 15(a). Plaintiff has failed to properly assert any such new claim, and as a result, Minnesota Life is not liable for an ERISA penalty.

16

### B.      Not the Plan Administrator

Even if the Court were to find that Plaintiffs asserted their claim for a penalty in a timely fashion, it would fail as a matter of law.  By its terms, Section 1132(c)(1) applies to a plan administrator.  Because Minnesota Life was not the plan administrator (as admitted by Plaintiffs, Doc. No. 50-1, p. 2), it cannot be liable for the penalty, even if it had received a request for plan documents.  See, e.g., Lockhart v. Blue Cross Blue Shield of Tenn., 503 F. App'x 926 (11th Cir. 2013) (plaintiff's claim for a penalty failed because the insurer was not the plan administrator); Vanderklok v. Provident Life and Acc. Ins., 956 F.2d 610 (6th Cir. 1992) (only the plan administrator can be held liable under § 1132(c)); Moran v. Aetna Life Ins. Co., 872 F.2d 296 (9th Cir. 1989) (insurance company is not liable under § 1132(c)).

### C.      Additional Interest

Minnesota Life contends that it has already overpaid any interest due under the Policy, and the Court agrees.  Plaintiffs rely upon O.C.G.A. § 33-25-10, but Georgia law is inapposite here.  The Policy provides:

> The death benefit will be paid in a single sum or by any other method agreeable to us and the beneficiary.  We will pay interest on the death benefit from the date of the insured's death until the date of payment.

AO 72A
(Rev.8/8
2)

> Interest will be at an annual rate determined by us, but never less
> than 4% per year compounded annually, or the minimum required by
> state law, whichever is greater.

[Doc. No. 57-2, p. 13]. The Policy has a similar interest provision for accidental

death benefits [Doc. No. 57-2, p. 16].

The Policy does not contain a choice of law provision. In the absence of a

choice of law provision, Georgia courts rely upon the *lex loci contractus* rule,

which is that the law of the state where the policy was delivered applies. <u>Lima

Delta Co. v. Global Aerospace, Inc.</u>, 752 S.E.2d 135, 141 (Ga. Ct. App. 2013).

Here, the policy was delivered to the group policyholder, Berkshire Hathaway, in

Nebraska. As such, Nebraska law regarding interest applies.

Under Nebraska law, interest accrues "from the date of receipt of proof of

death to the date of payment at the rate calculated pursuant to section 45-103 in

effect on January 1 of the calendar year in which occurs the date of receipt of

proof of death." Neb. Rev. St. § 44-3,143(2). Interest rates under this statute have

been calculated and are available on the Nebraska Supreme Court's website.

Minnesota Life told Plaintiffs' attorney on July 19, 2013, that benefits could be

paid to Ms. Juan after the company received a Form W-8BEN. If the interest rate

for 2013 applied, that rate was 2.137%. The applicable interest rate in 2014 and

18

2015 was 2.041%. These rates are less than the 4% minimum provided for by the Policy. Using any of these rates, Minnesota Life has already overpaid any interest that could be required because it paid interest at 6%.

### D.     Conclusion

For the reasons stated above, Minnesota Life is entitled to summary judgment on Plaintiffs' Claims, and its Motion for Summary Judgment [Doc. No. 57] is GRANTED.

## V.     Defendant Shaw Industries Group's Motion for Summary Judgment [Doc. No. 63]

Defendant Shaw Industries contends that it is entitled to summary judgment for two reasons: (1) it complied with its ERISA disclosure obligations and its actions do not otherwise justify the award of penalties; and (2) it is not liable for additional interest, if such interest is available, on Mr. Jacinto's insurance benefits.

### A.     ERISA Disclosure Obligations

First, Shaw Industries argues that it has complied with its ERISA disclosure obligations. The Court agrees. Plan administrators are obligated, upon written request,[2] to provide participants and beneficiaries with documents about how their

---

[2]  To the extent Plaintiffs attempt to argue that Shaw Industries had an obligation to disclose documents at some unspecified point in June 2013, after

AO 72A
(Rev.8/8
2)

plan is established and operated and about their level of retirement benefits.  See 29 U.S.C. §§ 1024(b)(4) and 1025(a)(1)(iii).  Here, the undisputed evidence shows that Shaw Industries complied with its disclosure obligations.

Shaw Industries promptly responded to Plaintiffs' counsel's request for information.  Mr. Satcher sent his first written request on August 14, 2013, and in response, on August 21, Shaw Industries requested an executed release of information from Mr. Jacinto's estate, which was its only condition for turning over the requested information.  Mr. Satcher did not respond with the requested information or in any way at all.  Defendant's actions, in this regard, were ERISA compliant.

The disclosure obligation is triggered "upon written request of any participant or beneficiary."  29 U.S.C. § 1024(b)(4).  A plan administrator's disclosure requirements only extend to third parties if a participant or beneficiary has "authorized in writing the release of the information to such third party."  See Bartling v. Fruehauf Corp., 29 F.3d 1062, 1072 (6th Cir. 1994) (citing DOL

---

allegedly being contacted by Plaintiffs' counsel's representative by telephone, Plaintiffs are mistaken.  Only a written request triggers disclosure obligations under ERISA.  See Christensen v. Qwest Pension Plan, 462 F.3d 919, 919 (8th Cir. 2006) (holding that telephonic requests do not trigger the penalty provision).

20

Advisory Opinion Letter 82-021A, p. 3).   Without authorization, the plan administrator is not required "to provide such information to persons who are neither participants nor beneficiaries." Id.  While a plan administrator may be penalized for ignoring a request for information, Shaw Industries quickly responded in an attempt to obtain the estate's consent.   In so doing, Shaw Industries acted consistently with ERISA.

Furthermore, even if the Court were to find that Shaw Industries did not comply with its disclosure requirements, Shaw Industries did not act with the type of bad faith that would give rise to penalties, and Plaintiffs did not suffer prejudice as would necessitate penalties.  Penalties are "in the nature of punitive damages designed more to punish the intransigent administrator and to teach ERISA fiduciaries a needed lesson than to compensate the pensioner for actual loss." Sandlin v. Iron Workers Dist. Council of Tennessee Valley & Vicinity Pension Plan, 716 F. Supp. 571, 574 (N.D. Ala. 1988).  In these circumstances, an award of penalties would not "further the purpose of the statutory provision" and are thus not appropriate.  Byars v. Coca-Cola Co., 517 F.3d 1256, 1272 (11th Cir. 2008).

## B.   Additional Interest

Second, Shaw Industries argues that it is not liable for additional interest on

21

Mr. Jacinto's insurance benefits because Minnesota Life, not Shaw Industries, is obligated to pay interest under the Policy. The Court agrees. The Policy provides that Minnesota Life, as the insurer, will pay interest on life insurance and accidental death insurance benefits [Doc. No. 57-2, pp. 13, 16]. The provision of Georgia law upon which Plaintiffs rely, provides the same. O.C.G.A. § 33-25-10(a) (each "insurer . . . shall pay interest on proceeds or payments under any individual policy of life insurance"). The result is the same under Nebraska law, which as discussed above, applies here. As Plan Administrator, Shaw Industries had no such obligation.

### C.    Other Benefits (401k)

Finally, to the extent Plaintiffs are attempting to assert a claim for unpaid 401k benefits, such a claim was not alleged in the Amended Complaint and as a result fails as a matter of law.

### D.    Conclusion

For the reasons stated above, Shaw Industries is entitled to summary judgment on Plaintiffs' Claims, and its Motion for Summary Judgment [Doc. No. 63] is GRANTED.

22

## VI.    Plaintiffs' Amended Motion for Summary Judgment [Doc. No. 50]

Given that the Court has granted summary judgment for Defendants, Plaintiffs' Amended Motion for Summary Judgment [Doc. No. 50] is DENIED.

## VII.    Conclusion

For the reasons stated above, Plaintiffs' Motion for Summary Judgment [Doc. No. 43] is DISMISSED as moot.  Plaintiffs' Motion to Dismiss [Doc. No. 70] is DENIED.  Defendant Minnesota Life's Motion for Summary Judgment [Doc. No. 57] is GRANTED.  Defendant Shaw Industries Group's Motion for Summary Judgment [Doc. No. 63] is GRANTED.  Plaintiffs' Amended Motion for Summary Judgment [Doc. No. 50] is DENIED.  The Clerk is DIRECTED to enter judgment in favor of Defendants and close this action.

**SO ORDERED**, this 25th day of March, 2016.

_____
**RICHARD W. STORY**
United States District Judge

23